JANVIER, Judge.
In the early morning of December 1, 1956, on what is known as the South Claiborne Overpass, in New Orleans, there was an automobile collision in which three cars were involved, and, as a result of *806 which, Edward Baumann, the owner and operator of one of the cars, sustained physical injuries and damage to his car. He brought this suit for damages against the other two drivers, and, alleging that the accident had resulted from the joint negligence of both and that Allstate Insurance Company had issued to one of the other drivers, Cyril J. Weber, a policy of liability insurance, he made that insurer a solidary defendant and prayed for solidary judgment against all three in the sum of $23,700.
He obtained solidary judgment in the sum of $3,583.97 against all three defendants, 'and Cyril J. Weber, the driver of one of the other cars, and his said insurer have appealed suspensively. The third defendant, Alcee Henry, has not appealed. Plaintiff has not answered the appeal.
The facts are somewhat involved. The overpass is a very wide elevated structure, accommodating several lanes of traffic, half of which are used by traffic proceeding in an uptown direction and the other half by traffic going the other way. In the middle of the structure, at the point at which the collision occurred, there is a concrete dividing barrier which is about nine inches high and about twenty-four inches wide. This overpass eliminates the necessity of crossing at grade several railroad tracks and a number of streets.
Baumann, in his car, was going in a downtown direction and was driving with the left side of his car nearest the dividing concrete barrier. On the other side of the barrier and going in the other or uptown direction were three other cars, one driven by Cyril J. Weber, another by Alcee Plenry, and a third by Mervin Martin Roth. The third car driven by Roth was not involved in the ensuing accident. Weber was driving his car in the traffic lane which is second from the barrier, which was to his left. About 75 or 80 feet back of the Weber car was a small truck driven by Roth who, though not involved in the accident nor in this ensuing litigation, was a very important witness. Weber and Roth were operating their cars at a speed of about 35 miles per hour and it is not contended that Weber was exceeding the speed limit. Back of both the Weber car and the Roth truck was the car of Henry which, in spite of the denial of excessive speed by Henry, was unquestionably being driven by him at a speed of from 65 to 70, miles an hour. The Henry car passed the Roth car to its left between it and the dividing concrete barrier and very shortly thereafter crashed into the left rear of the Weber car and then mounted and crossed the concrete barrier and ran directly into the front of the Baumann car which was going in the opposite direction on the other side of the concrete barrier. As already stated, there can be no doubt whatever about the tremendously excessive speed of the Henry car, and consequently there is no doubt at all about Henry’s liability. He, however, seems to be totally financially irresponsible and has not appealed.
The only question which confronts us is whether or not Weber was also guilty of negligence which had causal connection with the result. A determination of this question hinges entirely upon the question of whether Weber, without signal or other warning of his intention to do so and without looking to his rear or looking into his rear-view mirror, swerved to his left into the lane ahead of the oncoming Henry car when that car was so close that a crash was inevitable.
Weber says that he crossed partially into the lane to his left because in front of him was a taxicab proceeding at a very slow speed and that he intended to pass this taxicab. He says that the left side of his car was one or possibly two feet in the traffic lane to his left when, for the first time, he looked into his rear-view mirror and instantaneously saw that the Henry car was immediately behind him and going at a very high speed. He says *807 that he attempted to swerve back into his proper lane but that, before he could do so, the Henry car hit his car, bounded over the barrier and into the Baumann car.
Of course, in turning across to the other lane to his left without making certain that it was safe to do so and in giving no warning of his intention to cross over, Weber was negligent, since such an act is violative of the State Traffic Law, LSA-R.S. 32:235. However, if we could be convinced from the record that Weber’s car had entered the other lane to its left when Henry’s car was so far to the rear that there was ample opportunity for Henry to slow down and to avoid striking the Weber car ahead and that the Weber car had been in that lane for a substantial period of time, then the fact that Weber had failed to give any signal or had failed to look into his rear-view mirror would have entirely passed out of the picture and would have had no bearing on the ensuing accident. However, a study of the record has made such conclusion absolutely impossible.
Weber himself stated, without equivocation in a way which has made any misunderstanding impossible, that he did not look into his rear-view mirror until he had just about crossed the dividing line. He said: “ * * * I attempted to pass the cab in the inner lane, and I looked into my rear-view mirror while doing so and I saw a pair of headlights bearing down on me pretty hard.” And when asked whether he had seen the headlights to his rear before starting to cross, he said: “Well, let’s say I was moving from the center lane to the inner lane in an attempt to pass the cab.” He was asked: “In other words, you never noticed him at all until you were crossing into the partition?” He answered: “No, sir.”
He was asked:
"Q. Did you give any indication to the automobile that was behind you that you saw in your rear view mirror, to the effect that you were turning into the inside lane next to the partition? A. No, sir, I didn’t.
“Q. You never put your hand out? A. No, sir, the window was up.
“Q. The window was up, and you had no directional signal device, and you gave no directional signal ? A. No, sir.”
He was then asked how far to his rear was the other car when he first saw it, and he said: “I can only estimate the distance at approximately twenty feet.”
Roth, who was following Weber, did not give his own estimate of the distance between the Henry car and the Weber car when the latter was driven into the lane to its left in front of the former, but he said that after the accident he talked to Weber and that, although he himself did not think that Weber was at fault, Weber had insisted that it was his own fault. Roth, referring to Weber, said: “He said it wasn’t the fellow’s fault. I said it was. He said it wasn’t Henry’s fault. He said he run in front of him.” He was asked if that was what Mr. Weber had said, and he answered: “That’s what Mr. Weber says.”
The statements of the other defendant, Alcee Henry, are in most instances so palpably false that we would place no faith in them at all, but in this one instance he corroborates what the record otherwise abundantly indicates, i. e., that when he was about to pass the Weber car, Weber suddenly swerved partially into the lane ahead and that there was no opportunity to avoid the crash.
We are forced to the conclusion that the negligence of Weber in attempting to cross into the left lane had causal connection with the resulting damage and loss sustained by plaintiff Baumann, and that, as a consequence, both Weber and his insurer are solidarily liable along with Henry.
*808 The injuries to Baumann consisted of a fracture of three ribs. He remained in the hospital three days. There were lacerations of both shoulders and his chest and a slight sprain of the back. For a period of a few weeks he was required to visit his physician two or three times each week and the physician says that after that he saw him probably once a week or every ten days. And he also says that at the time of the trial, which was eighteen months after the accident, he was still treating the plaintiff. When asked what his bill would be at the time of the trial, he said: “about $550, I would say."
This item is attacked by defendants on the ground that there is no certainty about it, and that he had previously submitted a bill for $450. In view of the fact that the plaintiff was still under treatment and that he had been under the doctor’s care for a period of more than eighteen months, we think the allowance of $550 is not excessive.
It was stipulated that Baumann had lost in earnings $550, that the bill at Hotel Dieu had amounted to $63.70, the bill at The Charity Hospital had amounted to $40, and the bill for X-ray amounted to $10. The amount allowed for damage to the automobile, $350 is attacked as being excessive in view of the fact that there is evidence to the effect that it had a cash value of $210 and *a retail value of $315. In view of these figures it does appear that the amount allowed for the automobile is slightly excessive. However, in view of the physical injuries and the other items for which allowances were made, we see no reason to reduce the total amount allowed him. The physical injuries justify an award of at least $2,000.
Accordingly, the judgment appealed from is affirmed at the cost of appellants.
Affirmed.
McBRIDE, J., absent.